DECISION
Debra J. Corbin ("Corbin") brings this appeal from a decision of the Rhode Island Department of Human Services ("DHS"), finding that Corbin does not qualify for Medical Assistance ("MA") because she is not disabled as defined in the Social Security Act. For the reasons set forth below, this Court affirms the DHS decision. Jurisdiction is pursuant to G.L. 1956 § 42-35-15.
 I Facts and Travel
Corbin applied for MA on January 11, 2010. (DHS Record Ex. 6, Copy of AP-70 and Medical Release Form at 1-5.) In her application, Corbin, born May 11, 1962, listed Chronic Fatigue Syndrome ("CFS") as the "medical and mental problem" that precludes her from working.Id. at 1. She elaborated:
 "I have pain all over my body. Fatigue is so bad I have to stay in my apartment most of the time. I can't do grocery shopping or Laundry [sic] by myself. I can't clean my apartment. I can't walk far. If I leave the apartment every day my condition worsens." Id. *Page 2 
Corbin also checked the box signifying that she needs help preparing food and that she has trouble sleeping because of pain, night sweats, and restless legs. Id. at 3. She further stated that she cannot cook, vacuum, do laundry, dust or make beds.Id. Corbin explained that she cannot perform such tasks because she "get[s] fatigued doing anything constantly. [She] tr[ies] to pace [her]self." Id. She also stated that she needs help daily with both housework and transportation. Id. She, however, answered affirmatively that she washes her own dishes.Id. Corbin noted that she occasionally reads, listens to music, plays games, and talks on the phone. Id. She indicated that she only leaves her home when necessary. Id.
On the form, Corbin further indicated that she was no longer working, but did not note whether her lack of employment was due to her illness. Id. at 4. She stated that in her previous job, she spent the entire day sitting and did not have to carry, lift, walk, stand, or bend. Id. She also checked that she had previously applied for Social Security Disability benefits, but she failed to provide the date of that application. Id. at 5.
DHS then requested a history and physical exam, progress notes, lab data, diagnostic test results, psychiatric exam/evaluations, treatment plan, and consultative reports from her primary physician.Id. at 6. In response, Corbin submitted a physician examination report to DHS. (DHS Record Ex. 5, Copy of MA-63 (Doctor's form) for Debra J. Corbin, Jan. 12, 2010.) This report was completed by her primary physician, Dr. Mary Ellen O'Brien ("Dr. O'Brien") at Miriam Hospital. Id. at 1. On this form, Dr. O'Brien listed "Chronic Fatigue Syndrome vs. MDD"[1] as the "primary *Page 3 
diagnosis/findings." Id. at 2. Dr. O'Brien also recorded that she found Corbin's musculoskeletal system to be affected and found evidence of a mental disorder. Id. at 1. She stated that "the course of the disease can range from months to years, even on medications." She further noted that she had treated Corbin before and in the past had found that she had "severe sxs [symptoms] suggestive of Chronic Fatigue Syndrome vs. MDD." Id. She then noted that further examination and treatment were necessary and that medical records support her finding that Corbin's impairments would be expected to last longer than twelve months from onset.Id. Dr. O'Brien documented the onset of symptoms and date of diagnosis at January 2008. Id. at 2. She listed the supporting symptoms for Corbin's CFS as anhedonia, extreme fatigue, decreased energy, and isolation. Id. Dr. O'Brien, however, did not denote any supportive diagnostic tests in the pertinent location on the form. Id.
As the secondary symptom, Dr. O'Brien listed "h/o [history of] SVT"[2] and 2008 as the onset of symptoms and the date of diagnosis. She then reported "cardiac workup, EKG" as the "supporting symptoms and objective findings." Dr. O'Brien further stated that Corbin has neither been hospitalized nor admitted to any psychiatric or treatment center since she has been under the physician's care. Id.
Dr. O'Brien also indicated that Corbin was able to walk and stand for less than two hours in an eight hour work day; that she could bend occasionally; reach frequently, *Page 4 
and sit six out of eight hours. Dr. O'Brien also checked the box signifying that Corbin's ability to perform the following functions was markedly limited: ability to remember and carry out simple instructions; maintain attention and concentration in order to complete tasks in a timely manner; make simple work-related decisions; work at a consistent pace without extraordinary supervision; respond appropriately to changes in work routine or environment. Id. In addition, Dr. O'Brien acknowledged that Corbin's ability to interact appropriately with co-workers and supervisors was "moderately limited." Id. The physician recommended that Corbin follow up with support groups and therapy.Id. at 4. She also described Corbin as compliant with the prescribed treatment. Id. Dr. O'Brien noted that Corbin was taking Diltiazem, Nexium, and Lasix.
Corbin also submitted her records from Miriam Hospital to DHS. They included an admission on January 23, 2009. (DHS Record Ex. 8, Copies of Records from Miriam Hospital.) On that date, Corbin had an "[e]ssentially normal EGD[3] and colonoscopy."Id.
Corbin also submitted a July 29, 2009 report from Miriam Hospital for follow-up for lower extremity edema. The record notes that approximately one month earlier, she had complained of lower extremity edema and thought that it may have been related to Elavil, which she had started for her CFS. Id. Thus, according to the report, Corbin chose to stop taking the medication.Id. At this visit, she complained that her lower *Page 5 
extremity edema slightly worsened since her last visit.Id. In addition, Corbin reported persistent nausea for the prior three weeks. Id.
The report further explains that regarding her chronic fatigue, Corbin "currently is complaining of pain throughout her body which has gotten worse over the last year or so. The pain is in the feet, her legs, her knees, her hips, her shoulders, and her neck." (DHS Record Ex. 8, Copies of Records from Miriam Hospital.) Moreover, the report indicates that Corbin
 "complains of being so fatigued that she is unable to do her activities of daily living. She claims that she is too tired to do her laundry. Instead, she is able to leave the house to go purchase new clothes rather than do her laundry. She lives in a third-floor apartment and tries to avoid leaving the apartment secondary to fatigue as well as fear over catching the swine flu." Id.
At this visit, all laboratory data — including her albumin, LFTs, [4] TSH[5] and LV systolic function — were within normal limits. The report also states that Corbin insists that depression does not play a role in her CFS and rejects any additional psychiatric medications because she does not believe that they improve her condition. Id.
At an October 1, 2009 visit to Miriam Hospital, Corbin complained that over the year, "along with symptoms of chronic fatigue, knee pain, lower leg pain, multiple viruses, she has had cognitive changes including difficulties with memory such as driving and knowing where she is, forgetting the date of the year, [and] forgetting the President. . . ." Id. The medical report indicated that these cognitive changes were *Page 6 
"likely secondary to chronic fatigue or depression." Id. The report further stated that "although the patient does not endorse depression, she does have neurovegetative symptoms and it was discussed that cognitive changes included impaired attention and concentration can go along with chronic fatigue and that this is likely not due to an underlying dementia process. . . ."Id. Thus, she recommended that Corbin seek therapy for depression. Id.
In a report following a February 3, 2010 visit, Dr. O'Brien noted Corbin's complaints of lower back pain after sitting for long periods of time. Id. The report indicates that the intensity of this pain is 3/10. Id. Dr. O'Brien concluded that Corbin's lower back pain is "secondary to the fact that she is not very active and she spends most of her day sitting at the computer."Id. Thus, she referred Corbin to physical therapy to build up the muscles in her lower back. Id. She also instructed Corbin to apply heat to the affected area. Id.
At this visit, Corbin also complained of lower extremity edema on and off since the summer of 2009. In her report, Dr. O'Brien stated that Corbin's thorough cardiac workup was negative and her kidneys are within normal limits. Id. Dr. O'Brien also noted that despite her prescription for Lasix to treat her lower extremity swelling, Corbin "states that she has not been on the Lasix for a while and that she has continued to have intermittent lower extremity swelling every few weeks." Id. Dr. O'Brien did not find any evidence of edema in Corbin's extremities. Id. Thus, she noted that this chronic condition may be due to dietary indiscretion and again prescribed Lasix.
In addition, Corbin complained of right rib pain for which Dr. O'Brien prescribed pain medications. Id. Dr. O'Brien concluded that this pain was musculoskeletal in *Page 7 
nature, but not the result of a rib fracture. Id. She instructed Corbin to apply heat to the area. Id. At this visit, Dr. O'Brien also noted that Corbin sees a support group for her Chronic Fatigue Syndrome and that she has spoken to her numerous times about seeing a psychiatrist or therapist. Id.
On March 23, 2010, the Disability Review Team decided that Corbin was not disabled. (DHS Record, Ex. 4, AP-65, March 23, 2010.) On April 7, 2010, DHS issued its letter of denial to Corbin based upon a finding that she was not disabled per DHS Policy Section 0352.15.[6] (DHS Record Ex. 3, Denial letter from the Agency, April 7, 2010 at 1.) *Page 8 
On April 12, 2010, DHS received Corbin's request for a hearing. (DHS Record Ex. 1, DHS-121 form signed by Debra J. Corbin, April 12, 2010.) Therein, Corbin indicated that she had Chronic Fatigue Syndrome for a year and one half, and would like to see a doctor who specializes in CFS so she can return to work.Id. Corbin made a timely request for a hearing relative to the denial of her claim. (DHS Record Ex. 1, DHS-121 Form, April 12, 2010.)
On June 23, 2010, DHS held a hearing on this matter. (DHS Record Ex. 13, Admin. Hr'g Tr., June 23, 2010 ("Admin. Hr'g Tr.") at 1.) Corbin's sister attended the hearing along with Corbin. Sandra Brohen ("Brohen"), a social worker for the Medical Review Team ("MART"), appeared at the hearing as the agency's representative. Neither party was represented by counsel.
Brohen addressed DHS Policy Manual § 0352.15 which determines eligibility based on disability. Id. at 2. She explained that MART applies the five-step sequential evaluation process followed by Social Security ("SSI")[7] in determining an applicant's eligibility for benefits. Id. at 3. *Page 9 
In response to inquiry concerning the first step — whether the applicant is currently involved in any substantial gainful activity — Corbin testified that she was not currently employed.Id.
Brohen then addressed step two — whether Corbin has a severe medically determinable physical or mental impairment of required duration. She stated that consistent with the requirements of step two, MART reviewed the medical records to determine the severity of the alleged impairment. She stated that the medical evidence did not support a finding of a severe impairment. Id. Brohen further argued that the MA-63, completed by Dr. O'Brien, the Miriam Hospital records, and the AP-70, failed to *Page 10 
provide a consistent diagnosis. Id. She related that the findings were described as "Chronic Fatigue Syndrome verses a major depressive disorder," and "a history of SVT, Supraventricular Tachycardia."[8] Brohen then relayed to the Hearing Officer the substance of the physicians' reports submitted by Corbin.
Corbin testified that she began feeling the symptoms of CFS when she was working at a jewelry factory in August 2008.Id. at 5. She explained that she was employed for five years at that factory in a position where she remained seated for eight hours a day. She stated that she first became ill at that job when she had a virus, then pink eye, followed by another virus.Id. at 6. She stated that after this string of illnesses, she "hadn't felt good in two years." Corbin further remarked that she is seeing a counselor because she is depressed as a result of her inability to live a normal life due to her CFS. Id. at 7. She opined that she is disabled because she is prevented from living a normal life. Id. at 8.
The Hearing Officer then inquired as to whether Corbin has applied for Social Security Disability Insurance ("SSDI").Id. at 8. Corbin responded that she has been denied from SSDI once and has since found a lawyer to help her fill out her papers.Id. at 9. The Hearing Officer then explained that although Corbin's symptoms appear very serious and believable, under the law, she is required to evaluate the symptoms based on clinical evidence.Id. The Hearing Officer noted that although Dr. O'Brien found that Corbin was markedly limited in certain functions, the physician did not provide any additional evaluations to support her findings. *Page 11 
With respect to her typical daily activities, Corbin testified that such activities are limited to taking care of her cat, providing for her own food needs, as well as performing light house cleaning. Id. at 11. She stated that she can do the dishes and dust, but it takes her a very long time. Id. She further recounted that she can go grocery shopping but her ex-husband must carry her groceries up the stairs. Id. She additionally remarked that she cannot do the laundry alone because she cannot carry the clothing to be cleaned. Id. at 11-12. Corbin testified that she does not use any assistive devices to walk because her cane can become too heavy for her to carry at all times.Id. at 15.
Corbin also acknowledged that she has seen a counselor at Jewish Family Services. Id. at 12. The Hearing Officer stated that she would hold the record of hearing open for six weeks to allow Corbin time to submit the notes from the counselor and a psychiatrist if she sees one in the near future.Id. at 12, 13. The Hearing Officer explained that both notes and tests would be helpful because if a doctor makes a diagnosis, he or she will have notes explaining the findings. Id. at 13. She further requested that Corbin can get the notes from her SSI psychiatrist evaluations, if possible. Id. The Hearing Officer then closed the hearing, leaving the record open.Id. at 16.
Following that hearing, Corbin submitted her records from Jewish Family Services for Counseling. In a June 25, 2010 report, the social worker, Amanda Starr, LMHC, ("Starr") noted that Corbin stated that her primary problem is Chronic Fatigue Syndrome and "[s]ince she began to develop symptoms approximately two years ago, her daily living skills and coping strategies have decreased dramatically." (DHS Record Ex. 10, Counseling notes from Jewish Family Services, June 12, 2010, at 2.) Id. She further documented that Corbin reports a history of depression that she connects primarily to *Page 12 
having been in an emotionally abusive marriage and now believes that she is "`not sick because of depression but depressed because I am so sick.'" Id. Starr recorded Corbin's history of suicidality, of violence, and of depression, feelings of hopelessness and helplessness. Id. at 3.
The report from a June 29, 2010 psychiatric evaluation conveys that Corbin stated that she had pain "all over my body" and that the impact of this pain on her life was severe. (DHS Record Ex. 9, Copy of Psychiatric evaluation for Debra J. Corbin, June 29, 2010, at 2.) The report also indicated that Corbin's motor skills were constricted and her mood was sad/depressed. Id. at 3, 4. Her diagnoses from this visit included Chronic Fatigue Syndrome and MDD.Id. at 5.
On August 24, 2010, the Hearing Officer issued her decision. (DHS Ex. 12, DHS Decision, Aug. 24, 2010 ("Decision") at 1.)
She summarized the testimony of the agency representative and Corbin and then made findings of facts. Id. at 2-4. In the Hearing Officer's discussion of the medical evidence record, she denoted that she had received two MA-63 reports from Dr. O'Brien, notes from the Fain Clinic at Miriam Hospital and a psychiatric evaluation from Jewish Family Services. Id. at 4. Within this discussion, the Hearing Officer acknowledged that the first MA-63 described severe symptoms suggestive of CFS vs MDD.Id. Additionally, the Hearing Officer noted that within that MA-63, Dr. O'Brien described Corbin's limitations to walking, standing, and marked mental limitations. Id. The Hearing Officer compared that MA-63 with the MA-63 submitted by Dr. O'Brien on May 5, 2010. Id. She found that in the latter MA-63, Dr. O'Brien had listed the same diagnosis but very different physical and mental limitations. Id. The Hearing Officer *Page 13 
also noted the absence of objective findings remarking that no clinical test results were submitted to support the symptoms or diagnosis. Id.
The Hearing Officer then examined the notes from Corbin's July 28, 2009 visit to Fain Clinic at Miriam Hospital for her complaint of lower extremity edema. Id. at 6. The Hearing Officer denoted that during this visit, Corbin stated that she stopped taking medication prescribed to treat her CFS because she believed that the medication was causing the swelling she was experiencing. Id. The Hearing Officer also noted that aside from the edema, her exam on that date was otherwise essentially normal. Id. The Fain Clinic report stated that Corbin refused new psychiatric medicine to help with her fatigue, and was put on a low dose diuretic for swelling. Id.
The Hearing Officer also considered the examination notes from her visit on October 1 2009, at which time she complained of fatigue, body pain, lower extremity swelling, and changes to cognitive function. Id. The Hearing Officer found that the report revealed a normal physical exam and that the cognitive changes were discovered to be secondary to depression. Id. The Hearing Officer further noted that Corbin was referred to therapy but did not follow-up with those referrals. Id.
Moreover, The Hearing Officer examined notes from a February 2, 2010 visit to the Fain Clinic, when Corbin was complaining of lower back pain while sitting for a long period.Id. Test results from this visit were within normal limits.Id. The report indicated that Corbin had not been taking the Lasix that had been prescribed for swelling. Id. The Hearing Officer noted that Corbin had also complained of rib pain and was given medication for that complaint. Id. The Hearing Officer explained that the report documented that the back pain was most likely due to inactivity and sitting at the *Page 14 
computer all day, and any swelling was due to dietary indiscretion.Id. The Hearing Officer additionally noted that Corbin was currently working with a support group for her CFS, and her physician had spoken to her about seeing a therapist or psychiatrist on a number of occasions. Id.
The Hearing Officer noted that she had held the record open to allow Corbin to submit notes from a psychiatric visit. Id.
Corbin submitted a psychiatric report after the hearing, which report included a finding of MDD, a diagnosis rejected by Corbin along with the recommended treatment. Id. at 6.
The Hearing Officer then explained that medical opinion evidence is evaluated in accordance with 20 CFR 416.927.[9] She further explained that because Corbin's PCP is *Page 15 
part of a group of doctors at the Fain Clinic, those records were taken into consideration with no controlling weight given.Id. at 6.
The Hearing Officer then reviewed the aforementioned five-step sequential evaluation process for determining whether an individual is considered disabled under 20 C.F.R. § 416.920. Under this process, the Hearing Officer explained that the claimant bears the burden of proving steps one through four and DHS has the burden under the fifth step.
The Hearing Officer found that Corbin met the requirements of step one by proving that she was not engaged in substantial gainful activity ("SGA"), under 20 C.F.R. § 416.920. Id. Corbin was not currently working. Her last employment was at a jewelry *Page 16 
factory. Id. at 2. Having made that determination, the Hearing Officer considered the requirements of two.
The Hearing Officer found that Corbin failed to meet the requirements of step two and such failure was fatal to application. The Hearing Officer did not find it necessary to consider the remaining three steps.
The Hearing Officer addressed the standard by which DHS considers whether an individual has met the requirements of step two. Under step two, the applicant must prove that she has a medically determinable impairment that is severe or a combination of impairments that is severe and that the impairment has lasted or is expected to last for a continuous period of at least twelve months pursuant to 20 C.F.R. §§ 416.920(c) and 416.909.[10] The Hearing Officer noted that an impairment is not severe within the applicable regulations if it does not significantly limit an individual's physical or mental ability to perform basic work. In addition, the Hearing Officer stated that the element of impairment must be established by medical evidence including signs, symptoms, and laboratory findings as defined in 20 C.F.R. § 416.928.[11] She explained that DHS must *Page 17 
consider more than the individual's statement of symptoms in determining the issue of impairment. Id. DHS will consider the combined effect of all of an individual's impairments without regard to the severity of an individual's single impairment pursuant to 20 C.F.R. § 416.923.[12] However, if the applicant fails to prove that she has a severe medically determinable impairment or combination of impairments, he or she will not be found disabled.Id. The Hearing Officer further indicated that DHS does not consider factors such as age, education, and work experience in determining whether an applicant has met the requirements of step two. Id. *Page 18 
Turning to Corbin's application, the Hearing Officer determined that no clinical evidence exists of CFS. Id. She found that the treating physicians provided no blood test, no exam notes of pain at pressure points, no reports of swollen gland or a sore throat. Id. She further noted that Corbin's treating physician did not make a definitive diagnosis of CFS versus MDD. Id.
Additionally, the Hearing Officer considered the vast differences in the mental and physical limitations indicated in the two MA-63 forms. Id. The Hearing Officer found that despite Corbin's testimony regarding her complaints of daily intense pain, she did not provide any clinical evidence of a disorder that would result in such a level of pain. Id. She additionally noted that no longitudinal pain scales were submitted and only one office note even addressed a level of back pain, which was reported as 3/10. Id.
The Hearing Officer also commented on the report of the psychiatric evaluation received after the hearing made a diagnosis of MDD. Id. She noted that the diagnosis of MDD was made earlier during an initial visit. Corbin did not submit any clinical evidence of mental limitations to DHS resulting from that condition.Id.
After discussing this evidence, the Hearing Officer concluded that Corbin failed to meet her burden of proof on step two.Id. She found that Corbin failed to establish the existence of a medically determinable impairment because the diagnoses of her ailments were unsupported by acceptable medical evidence as required by regulations. Id. Accordingly, the Hearing Officer did not proceed in her analysis past the second step and concluded that Corbin was not disabled as defined in the Social Security Act and for the purpose of the MA program. Id. at 8. *Page 19 
On September 9, 2010, Corbin filed an appeal from the Hearing Officer's decision to this Court. In her appeal, Corbin seeks reversal of the Hearing Officer's decision contending that the Hearing Officer acted in excess of her statutory authority when she failed to weigh medical opinion as required by federal and state regulations. Corbin further avers that the Hearing Officer's decision is clearly erroneous as a result of the Hearing Officer's failure to find that the evidence failed to establish the existence of a medical impairment. Finally, Corbin contends that the DHS decision is clearly erroneous because the Hearing Officer erred as a matter of law in assessing Corbin's symptoms. In response, DHS rejects Corbin's contention that the decision is clear and maintains that the Hearing Officer was not required to specifically articulate the standards of 20 C.F.R. § 416.927(d). Moreover, DHS opines that the Hearing Officer did, in fact, consider the evidence in light of the requisite factors. Thus, DHS argues that the Hearing Officer's Decision was supported by the evidence and not affected by error of law.
 II Standard of Review
The court reviews a contested administrative decision pursuant to the Administrative Procedures Act, § 42-35-15(g). This section provides that:
 "The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings, or it may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions or decisions are:
 (1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law; *Page 20 
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." Sec. 42-35-15(g).
In reviewing an agency decision, this Court is limited to an examination of the certified record in deciding whether the agency's decision is supported by substantial evidence. JohnstonAmbulatory Surgical Assocs. v. Nolan,755 A.2d 799, 804-05 (R.I. 2000) (quoting BarringtonSch. Comm. v. Rhode Island State Labor Relations Bd.,650 A.2d 479, 485 (R.I. 1994)). The Rhode Island Supreme Court has defined substantial evidence as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion and means an amount more than a scintilla but less than a preponderance." Town of Burrillville v. Rhode Island State LaborRelations Bd., 921 A.2d 113, 118 (R.I. 2007) (citations omitted). In reviewing an agency decision, a "Superior Court trial justice `shall not substitute [his or her] judgment for that of the agency as to the weight of the evidence on questions of fact.'"Interstate Navigation Co. v. Division of Pub. Utils. Carriers of R.I., 824 A.2d 1282, 1286 (R.I. 2003) (citingRocha v. State Pub. Utils. Comm'n,694 A.2d 722, 725 (R.I. 1997)). Accordingly, only where "factual conclusions of administrative agencies . . . are totally devoid of competent evidentiary support in the record may the Superior Court reverse." Baker v. Department of Emp't Training Bd. ofReview, 637 A.2d 360, 363 (R.I. 1994) (quoting Milardo v.Coastal Res. Mgmt. Council, 434 A.2d 266, 272 (R.I. 1981)). The Court is nevertheless free to conduct de novo review of determinations of law made by the agency. Arnold v. RhodeIsland Dep't of Labor Training Bd. of Review,822 A.2d 164, 167 (R.I. 2003) (citing Nolan, 755 A.2d at 805). Courts, however, accord great deference to an agency's interpretation of *Page 21 
"a statute whose administration and enforcement have been entrusted to the agency." Town of Richmond v. Rhode Island Dep't of Envtl.Mgmt., 941 A.2d 151, 157 (R.I. 2008) (quoting Murray v.McWalters, 868 A.2d 659, 662 (R.I. 2008)).
 III Analysis A DHS and SSI
The Rhode Island Medical Assistance program is a federal and state program designed to "meet the medical needs of low income persons who are age 65 or over, blind, [or] disabled." DHS Regulation 0300.05. This program was established through G.L. 1956 § 40-8 to ensure that those who need public assistance receive adequate medical care and treatment when necessary. Sec. 40-8-1(b). DHS is the agency in Rhode Island which administers all federal and state public assistance, including the MA program. G.L. 1956 § 42-12-14; DHS Regulation 0300.10. DHS must promulgate income and resource rules, fee schedules and regulations to conform to the federal Social Security Act, 42 U.S.C. § 1396 et seq. and consequently receive federal funding under Medicaid. 40-8-13; seealso 42 U.S.C. § 1396 (stating that "[t]he sums made available under this section shall be used for making payments to the States which have submitted, and had approved by the Secretary, State plans for medical assistance"); 42 C.F.R. § 430.0 (1988) (explaining that the Social Security Act "authorizes Federal grants to States for medical assistance to low-income persons who are age 65 or over" and that [w]ithin broad federal rules, each State decides eligible groups"); 42 C.F.R. § 435.10 *Page 22 
(requiring that state plans conform with all federal rules and specify eligibility requirements for individuals to whom Medicaid is provided).
To determine if an individual is disabled, and thus, eligible for benefits under 42 U.S.C. § 1382, the Hearing Officer must consider a five-step analysis. If the Hearing Officer finds that an applicant is disabled or not disabled at a step, he or she will not continue the analysis to the following step. 20 C.F.R. § 416.920(a)(4). The five steps consist of the following:
 "(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)
 (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)
 (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)
 (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 416.960(b).)"
 (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See
paragraph (g) of this section and § 416.960(c).)" Id. *Page 23 
Under the second step, the step at issue in this matter, the applicant must have a severe impairment.Id. § 416.920(c). If the applicant fails to show an impairment or combination of impairments "which significantly limits [his or her] physical or mental ability to do basic work activities, [the hearing officer] will find that [he or she] does not have a severe impairment and [is], therefore, not disabled." Id. This step is a "de minimis standard." Lisi v. Apfel,111 F. Supp. 2d 103, 110 (D.R.I. 2000) (citing McDonald v.Secretary of Health and Human Servs.,795 F.2d 1118, 1124 (1st Cir. 1986)). Thus, a finding of a non-severe impairment may only be "made where `medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered.'"Id. (quoting McDonald,795 F.2d at 1124) (citation omitted).
 B Evidence Establishing the Existence of a MedicalImpairment
Corbin avers that the Hearing Officer's decision was clearly erroneous because the Hearing Officer failed to recognize that the existence of impairments may be based on signs and symptoms and, instead, based her decision merely on the lack of clinical test results to verify CFS. Moreover, Corbin opines that the Hearing Officer's decision was based on an error of law because the Hearing Officer disregarded the guidance in a Social Security Ruling about CFS, which stated that CFS is a systemic disorder consisting of many symptoms, including depression. DHS counters that the medical evidence of either examination or laboratory results does not prove that Corbin is disabled as a result of CFS. Therefore, DHS maintains that the decision was not clearly erroneous. *Page 24 
To find a medically determinable impairment, a Hearing Officer may consider symptoms, signs, and laboratory findings. 20 C.F.R. § 416.928. According to 20 C.F.R. § 416.928(A), symptoms are an applicant's own description of his or her medical impairment and signs are "anatomical, physiological, or psychological abnormalities which can be observed apart from [the applicant's] statements (symptoms)."Id. The rule also defines laboratory findings as "anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques."Id. For example, these techniques include chemical tests, X-rays, and psychological tests. Id.
Through Social Security Ruling, SSR 99-2p, Evaluating Cases Involving Chronic Fatigue Syndrome (CFS) ("SSR 99-2p"), [13] the Social Security Administration elaborated on the determination of CFS as a medically determinable impairment. SSR 99-2p explains that CFS can be a medically determinable impairment as a basis of a disability when it is accompanied by appropriate medical signs or laboratory findings. Social Security Ruling, SSR 99-2p, Titles II and XVI: Evaluating Cases Involving Chronic Fatigue Syndrome (CFS),64 Fed. Reg. 23380-03, 23381 (April 30, 1999). According to this Rule, CFS involves
 "clinically evaluated, persistent or relapsing chronic fatigue, that is of new or definite onset (i.e., has not been lifelong), cannot be explained by another physical or mental disorder, is not the result of ongoing exertion, is not substantially alleviated by rest, and results in substantial reduction in previous levels of occupational, educational, social, or personal activities." Id.; see also D'Andrea v. Commissioner of Social Security Admin., 389 F. App'x 944, 946 (11th Cir. 2010) (adopting this definition). *Page 25 
Although no specific etiology or pathology has yet to be established for this disease, SSR 99-2p provides examples of medical signs that will establish the existence of a medically determinable impairment for an individual suffering from CFS. SSR 99-2p,64 Fed. Reg. 23380-03, 23381. These signs must be documented over a period of at least six consecutive months and include the following: "palpably swollen or tender lymph nodes on physical examination; non-exudative pharyngitis; persistent, reproducible muscle tenderness on repeated examinations including the presence of positive tender points; or, any other medical signs that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record." SSR 99-2p,64 Fed. Reg. 23380-03, 23382; see also D'Andrea,389 F. App'x at 946.
Additionally, no specific laboratory findings are widely accepted to diagnose CFS. SSR 99-2p, 64 Fed. Reg. 23380-03, 23382. Nevertheless, administrative law judges or hearing officers may rely upon certain laboratory findings elaborated in SSR 99-2p to establish the existence of a medically determinable impairment in CFS applicants. Id.; see also Harvey L. McCormick, 1 Social Security Claims andProcedures § 8:87, at 625 (6th ed. 2009) ("Although currently there are no specific laboratory findings that are widely accepted as being associated with CFS, according to Soc. Sec. Rul. 99-2p, adjudicators may rely on [the listed] laboratory findings to establish the existence of a medically determinable impairment in an individual with CFS. . . ."). The laboratory findings listed therein include the following:
 "— an elevated antibody titer to Epstein-Barr virus (EBV) capsid antigen equal to or greater than 1:5120, or early antigen equal to or greater than 1:640; *Page 26 
 — An abnormal magnetic resonance imaging (MRI) brain scan;
 — Neutrally mediated hypotension as shown by tilt table testing or another clinically accepted form of testing; or,
 — Any other laboratory findings that are consistent with medically accepted clinical practice and are consistent with the other evidence in the case record; for example, an abnormal exercise stress test or abnormal sleep studies, appropriately evaluated and consistent with the other evidence in the case record." SSR 99-2p, 64 Fed. Reg. 23380-03, 23382; see also McCormick, 1 Social Security Claims and Procedures § 887, at 625.
Moreover, SSR 99-2p clarifies that "ongoing deficits in areas such as short-term memory, information processing, visual-spatial difficulties, comprehension, concentration, speech, word-finding, calculation or other symptoms suggesting persistent neurocognitive impairment" will constitute medical signs establishing the presence of a medically determinable impairment when they are documented by mental status examination or psychological testing. SSR 99-2p,64 Fed. Reg. 23380-03, 23382; see also D'Andrea,389 F. App'x at 946.
This Court will also afford great deference to agency decisions under the "arbitrary and capricious" standard of review.Goncalves v. NMU Pension Trust,818 A.2d 678, 682-83 (R.I. 2003). Accordingly, this Court will uphold the administrative decision unless the officer did not act within her authority and her decision was not "rational, logical, and supported by substantial evidence." Id. (citingDoyle v. Paul Revere Life Ins. Co.,144 F.3d 181, 184 (1st Cir. 1998)).
In the instant matter, the Hearing Officer determined that no clinical evidence provided supported the CFS determination. (Decision at 7.) Specifically, the Hearing Officer noted the lack of a definitive diagnosis and the lack of clinical evidence of a *Page 27 
disorder that would cause pain to the level that Corbin claimed.Id. The only evidence that the Hearing Officer discovered to support Corbin's complaints of pain was an office note that recorded Corbin's back pain as 3/10. When evaluating the medical evidence, the Hearing Officer noted the number of prescribed medications that Corbin refused to take and the number of referrals that Corbin failed to follow. Id. at 5; see Snedeker v. Commissioner ofSocial Security, 244 F. App'x 470, 474 (3d Cir. 2007) (finding that the applicant's complaints "are undermined by his not taking prescribed medication and infrequently seeking medical treatment"). The Hearing Officer also stated that doctor's notes indicated that her lower back pain was most likely due to inactivity and sitting at her computer all day. (Decision at 5.)
Furthermore, the Hearing Officer explained that the various laboratory tests performed, such as a thorough cardiac work-up and echocardiogram, all had normal results. Id. She additionally noted the inconsistencies within Dr. O'Brien's recorded limitations on the two MA-63 reports. Id. at 4. Specifically, on the May 2010 MA-63, Dr. O'Brien found that Corbin had much less physical limitation and only slight mental limitations in comparison to the January 12, 2010 MA-63 report, which stated that Corbin suffered from extreme fatigue, decreased energy and isolation. Id.
Given this evidence and her explanation, the Hearing Officer did not base her conclusion on a mere "lack of clinical data"; instead, she based this decision on a lack of clinical data or evidence which supported a diagnosis of CFS. See D'Andrea,389 F. App'x at 948 (affirming the administrative law judge's determination that the applicant's CFS was not a severe impairment). This decision is further bolstered by the guidance *Page 28 
within SSR 99-2p because Corbin's clinical data and evidence did not exhibit any of the results described as a medically determinable impairment within SSR 99-2p.
Moreover, a hearing officer is permitted to reject an applicant's testimony regarding his or her symptoms if the hearing officer did not find it credible and explains his or her rationale.Snedeker, 244 F. App'x at 474. As a general rule, this Court will not substitute its judgment for that of the agency when evaluating the credibility of testimony. Costa v. Registrar ofMotor Vehicles, 543 A.2d 1307, 1309 (R.I. 1988).
In the present matter, the Hearing Officer found that the evidence demonstrated that Corbin failed to take prescribed medication, follow referrals, or go to counseling as directed by her treating physician. (Decision at 4.) For example, the Hearing Officer noted that Corbin quit taking her medication for CFS. Id. Likewise, she found that, although eventually attending therapy, Corbin disagreed that her cognitive changes involved depression and refused to follow referrals to therapy or counseling. Id. at 6. The Hearing Officer also found Corbin's symptoms to be unsupported by medical evidence required by the regulations. Id. at 7. She specifically noted that Dr. O'Brien had found her back pain was a result of inactivity and any swelling was due to dietary indiscretion. Id. at 6. The Hearing Officer also particularly noted that all of Corbin's relevant test results were within normal limits. Id. at 6.
By articulating her rationale, the Hearing Officer supported her decision to deny Corbin's appeal, despite Corbin's testimony concerning her symptoms.[14] See D'Andrea,389 F. App'x at 948 *Page 29 
(sustaining an administrative law judge's rejection of the subjective symptoms of the applicant as a result of a credibility determination that was supported by the evidence);Snedeker, 244 F. App'x at 474 ("[Applicant's] complaints of disabling symptoms are undermined by his not taking prescribed medication and infrequently seeking medical treatment.") As that decision is supported by competent evidence, this Court declines to substitute its judgment for that of the Hearing Officer.Costa, 543 A.2d at 1309; see also Holiday v. Barnhart,76 F. App'x 479, 482 (3d Cir. 2003) (explaining that "because the credibility of witnesses is quintessentially the province of the trial court, not the appellate court, we defer to an ALJ's credibility determinations" (internal quotations and alteration omitted) (citation omitted)). Given that the Hearing Officer based her decision on the competent evidence on the record, the Hearing Officer's decision was neither clearly erroneous nor arbitrary and capricious.
 C Weight Afforded to Treating Physician's Opinion
Corbin contends that the Hearing Officer's decision is clearly erroneous because she failed to articulate or apply the standard set forth in 20 C.F.R. § 416.927(d) regarding a treating physician. Conversely, DHS maintains that a Hearing Officer is not required to cite to particular regulations or cases. DHS therefore contends that the Hearing Officer's decision is not clearly erroneous because she sufficiently laid out her rationale and decision.
A Hearing Officer must give controlling weight to the treating physician's opinion if that opinion is "well supported by medically acceptable clinical and laboratory *Page 30 
diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d); see Soto-Cedeno v.Astrue, 380 F. App'x 1, 3 (1st Cir. 2010). Pursuant to 20 C.F.R. § 404.1502, a treating source is an applicant's "own physician, psychologist, or other acceptable medical source who provides [the applicant], or has provided [him or her], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the applicant]." Thus, a treating physician may be considered to be the applicant's "own physician, osteopath or psychologist (including outpatient clinic and health maintenance organization) who has provided the individual with medical treatment or evaluation, and who has or had an ongoing treatment and physician-patient relationship with the individual."Jones v. Apfel, 66 F. Supp. 2d 518, 524-25 (S.D.N.Y. 1999) (quoting Schisler v. Bowen,851 F.2d 43, 46 (2d Cir. 1988)) (emphasis added); see alsoFavors v. Astrue, No. 06-CV-526, 2008 WL 2790178, at *3 (W.D.N.Y. July 17, 2008) (affirming the administrative law judge's application of controlling weight to the opinions of the applicant's "numerous treating physicians from the Erie County Medical Center outpatient clinic"); 3 Soc. Sec. LP § 37:76 (2009) (explaining that an outpatient clinic may be considered a treating source).
Treating physicians' opinions warrant controlling weight given their unique position that results from the continuity of treatment and developed relationships with patients. Petrie v. Astrue, No. 10-2070-cv.,2011 WL 781901, at *3 (2d Cir. Mar. 8, 2011) (per curiam) (quotingMongeur v. Heckler,722 F.2d 1033, 1039 n. 2 (2d Cir. 1983) (per curiam)). If the physician's relationship is based not on treatment, but solely on the claimant's need to obtain a report in support of his or her claim for disability, the physician will not be considered a treating source. 3 Soc. Sec. LP § 37:77. *Page 31 
In addition, the Hearing Officer may not afford controlling weight to a treating physician's opinion when it is inconsistent with other substantial evidence in the record. Petrie,2011 WL 781901, at *3 (quoting Halloran v. Barnhart,362 F.3d 28, 32 (2d Cir. 2004)); Lema v. Astrue, No. 09-11858-MLW, 2011 WL 1155195, at *3 (D. Mass. Mar. 21, 2011). When the Hearing Officer determines that the treating physician's opinion does not deserve controlling weight, he or she must provide "good reasons" for the weight afforded and consider various factors in determining how much weight to give the opinion. 20 C.F.R. § 416.927(d). These factors include:
 "(i) the frequency of examination and the length, nature and extent of the treatment relationship;
 (ii) the evidence in support of the treating physician's opinion;
 (iii) the consistence of the opinion with the record as a whole;
 (iv) whether the opinion is from a specialist; and
 (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion." Halloran, 362 F.3d at 32; see also 20 C.F.R. 416.927(d) (explaining these factors with detail); Plasse, 2009 WL 4927490, at *4 (stating these factors).
In considering these factors, the Hearing Officer is neither required to mention every item of testimony presented nor to explain his or her reasoning regarding the weight afforded to each piece of evidence leading to his or her decision. Petrie,2011 WL 781901, at *4 (quoting Mongeur, 722 F.2d at 1040) (citing Halloran, 32 F.3d at 32; Berry v. Schweiker,675 F.2d 464, 469 (2d Cir. 1982)).
In the instant matter, the Hearing Officer determined that "[s]ince the appellant's PCP is part of a group of doctors at the Fain Clinic all records were taken into consideration with no controlling weight given." (Decision at 6.) The Hearing Officer failed to elaborate on her statement and then continued to consider the evidence. The *Page 32 
Hearing Officer, however, erred in this conclusion because she should have considered the Fain Clinic and the physicians she obtained treatment from at the Clinic as her primary care provider, her treating source. Corbin sought continuous treatment there.See Jones, 66 F. Supp. 2d at 524-25; Pastor v. Bowen, No. 87 CIF. 6336 (MJL), 1988 WL 131301, at *3 n. 3 ("There can be no question that the [outpatient] clinic qualifies as a treating source since [applicant] had received medical treatment and evaluations therefrom and had an ongoing relationship therewith. (citing Schisler, 851 F.2d at 46); seealso 20 C.F.R. § 404.1502. A treating source, this Court makes clear, need not be one individual physician, but may be an outpatient clinic if an ongoing relationship is established.See Jones, 66 F. Supp. 2d at 524; Pastor,1988 WL 131301, at *3 n. 3; 3 Soc. Sec. LP § 37:77. Thus, the Hearing Officer misstated the law when she concluded that the she did not have to give controlling weight to the records from Fain Clinic, Corbin's treating source.
Contrary to this statement, the Hearing Officer did rely on the Fain Clinic records, and she did appear to give them controlling weight as evidenced by her discussion of these records. In her consideration of these records, the Hearing Officer found that the Fain Clinic had not made any findings which established a disability due to Corbin's CFS. Specifically, as previously set forth herein, the Fain Clinic records do not support any finding of disability through the clinical evaluations of Corbin and her CFS.See Part III, B, supra. Thus, while the Hearing Officer erred in stating that she did not find the Fain Clinic deserving of controlling weight, she properly considered their records, finding that no disability was shown. See DeSimone Elec., Inc. v. CMG,Inc., 901 A.2d 613, 620-21 (R.I. 2006) (stating that a court may affirm "`the orders and judgments of a *Page 33 
trial court when the reasons given by the trial court are erroneous in circumstances in which there are other valid reasons to support the order or judgment appealed from'" (quoting Levine v. BessEaton Donut Flour Co., 705 A.2d 980, 984 (R.I. 1998)) (citingJordan v. Jordan, 586 A.2d 1080, 1085 (R.I. 1991))). Thus, despite the Hearing Officer's erroneous statement, Corbin's substantial rights were not prejudiced because the Fain Clinic records did not evidence a disability upon which to base a claim.
 D The Hearing Officer's Assessment of the Symptoms
Corbin further maintains that the Hearing Officer's decision was affected by error of law because the Hearing Officer failed to make any inquiry into fatigue, pain or symptoms as required by 20 C.F.R. § 416.929. DHS, however, maintains that no definitive medical evidence was presented to establish an impairment's existence.
Pursuant to 20 C.F.R. § 416.929(a), the Hearing Officer must consider all of the applicant's symptoms, including pain, within her decision. This section, however, also limits the Hearing Officer's assessment of these symptoms to "the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence, and other evidence." 20 C.F.R. § 416.929(a); seealso 20 C.F.R. § 416.929(b) ("Your symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness, will not be found to affect your ability to do basic work activities unless medical signs and laboratory findings show that a medically determinable impairment(s) is present."); Jones v. Commissionerof Social Security, 85 F. App'x 806, 808 (3d Cir. 2003) (stating that a medically determinable impairment is required under 20 C.F.R. § 416.929). Thus, when the Hearing Officer reviews an application, she first must find that "medical signs or *Page 34 
laboratory findings show that you have a medically determinable impairment(s) that could reasonably be expected to produce [his or her] symptoms, such as pain." 20 C.F.R. § 416.929(a). Only then will the Hearing Officer "evaluate the intensity and persistence of [his or her] symptoms so that [the Hearing Officer] can determine how [his or her] symptoms limit [his or her] capacity for work."Id. § 416.929(c)(1); see also Barkes v. Apfel,155 F.3d 557, 1998 WL 394178, at * 5 (4th Cir. 1998) (table) (stating that the applicant "must show a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind of severity, but the pain the claimant alleges she suffers" (citing Craig v. Chater,76 F.3d 585, 594 (4th Cir. 1996))).
As the Hearing Officer found that Corbin did not have a medically determinable impairment, she was not required to evaluate Corbin's pain intensity. See 20 C.F.R. § 416.929; Barkes,155 F.3d 557, 1998 WL 394178, at *5. Accordingly, the Hearing Officer's decision is not clearly erroneous.[15]
 III Conclusion
After review of the entire record, this Court finds that the decision of DHS is supported by reliable, probative, and substantial evidence and is not affected by error of law. The administrative decision appealed from was neither arbitrary nor capricious and did not constitute an abuse of discretion. Appellant's substantial rights have not been *Page 35 
prejudiced. For the reasons set forth above, this Court affirms DHS's decision denying Corbin's application for MA and denies the appeal. Counsel shall submit the appropriate judgment for entry.
[1] MDD is an abbreviation for Major Depressive Disorder.See, e.g., Mason v. SmithKline Beecham Corp.,596 F.3d 387, 395 (7th Cir. 2010) (defining Major Depressive Disorder as MDD); Dorsett v. Sandoz, Inc.,699 F. Supp. 2d 1142, 1152 (C.D. Cal. 2010) (defining Major Depressive Disorder as MDD); Mason v. Astrue, Slip. Op., No. 08-11957-DPW, 2010 WL 1236305, at *4 (D. Mass. Mar. 5, 2010) (defining Major Depressive Disorder as MDD).
[2] SVT is the abbreviation for supraventricular tachycardia, which is "a type of tachycardia (rapid heart beat) which is produced by impulses originating in an atrium (upper heart chamber) and impulses originating in the atrioventricular junction (atrioventricular node)." J.E. Schmidt, M.D., 5 Attorneys' Dictionary of Medicine and WordFinder, at S-409, S-423 (2000).
[3] EGD is the abbreviation for esophagogastroduodenoscopy, which is the "inspection (visual examination of the esophagus (gullet), stomach, and duodenum (first part of small intestine)." Schmidt, 2 Attorneys' Dictionary of Medicine and WordFinder, at E-31, E-200. An EGD is used for an "(1) evaluation of structural abnormalities of the upper portion of the gastrointestinal tract. (2) Diagnosis of ulcers, tumors, and other disorders of the upper gastrointestinal tract. (3) Removal of tissue samples for laboratory evaluation. (4) Removal of foreign bodies."Id. at E-200.
[4] LFT is the abbreviation for liver function test. Mosby'sMedical, Nursing, and Allied Health Dictionary
691 (3d 1990).
[5] THS is the abbreviation for thyroid-stimulating hormone. A TSH stimulation test is a test that "measures the ability of the thyroid gland to take up radioiodine in response to the administration of thyroid-stimulating hormone." Schmidt, 6 Attorney's Dictionary ofMedicine and Word Finder, at T-269.
[6] This section states in pertinent part:
 "A. To qualify for Medical Assistance, an individual or member of a couple must be age 65 years or older, blind or disabled.
 B. The Department evaluates disability for Medical Assistance in accordance with applicable law including the Social Security Act and regulations (20 C.F.R sec. 416.901-416.998).
 1. For any adult to be eligible for Medical Assistance because of a disability, he/she must be unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than twelve (12) months (20 C.F.R. sec. 416.905).
 2. The medical impairment must make the individual unable to do his/her past relevant work (which is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it" (20 C.F.R. sec. 416.960(b)) or any other substantial gainful employment that exists in the national economy (20 C.F.R. sec. 416.905).
 3. The physical or mental impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. The individual's statements alone are not enough to show the existence of impairments (20 C.F.R. sec. 416.908)." DHS Policy § 0352.15.
[7] This five-step evaluation process is provided for within 20 C.F.R. § 416.920, which states in pertinent part:
 ". . . .
 (4) The five-step sequential evaluation process. The sequential evaluation process is a series of five "steps" that we follow in a set order. If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step. If we cannot find that you are disabled or not disabled at a step, we go on to the next step. . . . These are the five steps we follow:
 (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled. (See paragraph (b) of this section.)
 (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 416.909, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. (See paragraph (c) of this section.)
 (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled. (See paragraph (d) of this section.)
 (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled. (See paragraph (f) of this section and § 416.960(b).)
 (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled. (See paragraph (g) of this section and § 416.960(c).)
 ". . . ." 20 C.F.R. § 416.920.
[8] Brohen continued to define SVT as GBRD [sic], also referred to as acid reflux. (Admin. Hr'g Tr. at 3.)
[9] 20 C.F.R. § 416.927 states the following:
 ". . . .
 (d) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.
 (1) Examining relationship. Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.
 (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.
 (i) Length of the treatment relationship and the frequency of examination. . . .
 (ii) Nature and extent of the treatment relationship. . . .
 (3) Supportability. The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .
 (4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.
 (5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.
 (6) Other factors. When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion. . . . . . . ."
[10] 20 C.F.R. § 416.909 requires that "[u]nless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months. We call this the duration requirement."
[11] This section provides the following:
 "(a) Symptoms are your own description of your physical or mental impairment. If you are a child under age 18 and are unable to adequately describe your symptom(s), we will accept as a statement of this symptom(s) the description given by the person who is most familiar with you, such as a parent, other relative, or guardian. Your statements (or those of another person) alone, however, are not enough to establish that there is a physical or mental impairment. (b) Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.
 (c) Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 416.928.
[12] This section provides that
 "[i]n determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity. If we do find a medically severe combination of impairments, the combined impact of the impairments will be considered throughout the disability determination process. If we do not find that you have a medically severe combination of impairments, we will determine that you are not disabled (see §§ 416.920 and 416.924)." 20 C.F.R. § 416.923.
[13] The Hearing Officer's decision does not cite to SSR 99-2p; nevertheless, no duty exists which requires administrative law judges to explicitly discuss social security rulings. Holiday v. Barnhart,76 F. App'x 479, 482 (3d Cir. 2003).
[14] "In fulfilling his duty to conduct a full and fair inquiry, the [administrative law judge] is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision." Plasse v. Astrue, No. 08-357 S, 2009 WL 4927490, at *4 (D.R.I. Dec. 21, 2009) (citing CarrilloMarin v. Secretary of Health and Human Servs.,758 F.2d 14, 17 (1st Cir. 1985)). Given the Hearing Officer's finding based on substantial evidence, she was not required to order further exams on Corbin.
[15] This Court recognizes that Corbin's claim may be reopened within four years if there is "good cause." 20 C.F.R. § 404.988(b); see Thomas E. Bush,
2 Social Security Disability Practice (2d ed. 2010) § 373. "Good cause" includes when "new and material evidence is furnished." 20 C.F.R. § 404.989(a); see alsoPurter v. Heckler, 771 F.2d 682, 695-96 (3d Cir. 1985) (finding that an applicant presented new and material evidence to merit reconsideration of his earlier claims).
 *Page 1